Agudath Israel of America 23572 Governor Cuomo targeted Orthodox Jews, the Orthodox Jewish community, and Orthodox Jewish institutions for enhanced restrictions with Executive Order 202.68. It was, in the phrase that's used in Rukumi, his impermissible object. Governor Cuomo did so on October 5th, before the Executive Order was issued, when he said that he planned to, quote, meet with members of the ultra-Orthodox community, and, quote, threatening that he will close the religious we know religious institutions have been a problem. The next day, on October 6th, again before the Executive Order was issued, he said, quote, this is not a highly nuanced, sophisticated response. This is a fear-driven response. This is not a policy being written by a scalpel. This is a policy being cut by a hatchet. On October 9th, the morning we had the TRO hearing, Governor Cuomo went on CNN to declare, quote, the cluster is predominantly an Orthodox, an ultra-Orthodox cluster, period, close quote. On October 13th, the governor publicly said, we're now having issues in the Orthodox community in New York, where because of their religious practices, we're seeing a spread, close quote. And there are many other statements in the same timeframe and extending beyond that, where the governor made absolutely clear that the purpose and the object of Executive Order 20268 was to target Orthodox Jews, the Orthodox Jewish community. So, Mr. Schick, this is Jez Loyer. I might have been receptive to your argument, had Mr. Mastro not had the argument just before yours, where he is claiming that the Roman not just one particular, and obviously the amicus briefs indicate a concern by a number of different religious organizations. So it's not just one particular religion or religious organization. It's several religious organizations that represent several different religions. Is that fair? It's fair to say three different things with regard to this, Your Honor. First, that people of all faiths and all people of good faith are concerned and outraged by the governor's statements and by the governor's targeting. Second, it's fair to say that the executive orders as written cover certain geographic areas, or as implied, cover certain geographic areas, and therefore all religious institutions within those areas are subject to the same rule. That said, third thing, as Judge Comedy said in the decision on the TRO motion of the diocese, quote, the governor made it remarkably clear that he had ultra-Orthodox institutions in mind. So I think we can separate out what the object of the governor's executive order was and separate that from the fact that, as written, it certainly offends people of all faiths and it certainly captures institutions of all faiths. And under Masterpiece Cakeshop, these statements are improper and they certainly trigger strict scrutiny. They are tantamount to a violation of free exercise and the state cannot meet the high standard of strict scrutiny. And in fact, they don't contest that and their papers don't even make the argument that they satisfy. Well, so you heard Mr. Parker, obviously, in the prior argument, tell us that strict scrutiny does not apply here under our own case law, largely because the executive order applies to both faith-based organizations and secular organizations alike, and therefore rational basis review is appropriate. What's your response to that? So I think Mr. Parker was responding to the particular comparability argument that Mr. Mastro was making so eloquently and so accurately. However, we're beginning our argument that the plaintiffs, the appellants in this case, have additional arguments above and beyond the comparability argument. And those arguments are that they've been targeted. It's much more, this is not South Bay. This is Central Rabbinical. This is Lukumi. This is Masterpiece Cakeshop. This is where the sole adjudicator, Governor Cuomo... So, excuse me, this is Judge Rekha. The Supreme Court has said that, quote, members of the court have disagreed on the question whether statements made by lawmakers may properly be taken into account in determining whether the law intentionally discriminates on the basis of religion. That's from Justice Scalia's concurrence in Church of Lukumi Babalu versus Hialeah 508 U.S. 520. Cakemaster was different because, in that case, in Masterpiece Cakeshop, the remarks were made by the adjudicatory body deciding the very case. So, I don't see that you can rely on the Masterpiece Cakeshop decision for the notion that the lawmakers comments are of the prominence that you wish to give. Thank you, Judge Rekha, for letting me address that head-on. I believe that this case is certainly as easy a case as Masterpiece Cakeshop in that regard. What Justice Scalia was referencing, as Justice Kennedy mentions in his Masterpiece Cakeshop opinion, is that with respect to legislative intent, there's a question about when looking at a legislative enactment, one looks at the comments of particular legislators during the debate or during the process. However, Justice Kennedy in Masterpiece Cakeshop says that's irrelevant to a situation we have in the adjudicatory body. Over here, there's no doubt that Governor Cuomo is the adjudicator. He's the sole adjudicator. There was no legislation. Executive Order 202.68 was not enacted or reviewed by the legislature. It was conjured up by Governor Cuomo. In fact, there was testimony in the diocese case from the Department of Health epidemiologist put on by the state that he was not aware of it. It was done by the governor's office, not the Department of Health. So, Governor Cuomo is the sole adjudicator. He decides what the executive order should say. He decides which neighborhoods, which communities, which institutions should be subject to its restrictions. And he decides on the enforcement. It is a case like Masterpiece Cakeshop on steroids, I would submit, in that regard. So, in addition, as I was getting to before, the issue of strict scrutiny here is different than the argument that just preceded this, because we have these undisputed, long series of statements, day after day after day, targeting a specific minority group, the ultra-orthodox community, targeting without any evidence, without any data, without anything behind it, to subject them to these restrictions. And, in fact, the restrictions have a devastating effect of curtailing and making impossible their religious practice. There are large churches in these neighborhoods of Brooklyn and initially Queens. There are large synagogues, certainly synagogues with capacities of hundreds and hundreds of people. And to limit it to 10 means that people can't come and pray. Am I right, Mr. Schick, that you also don't object to the 25 percent limitation? That's correct, Your Honor. Under Phase 4, which is what New York is in and what would be governing every other area in New York State, it's 33 percent. But we're certainly not going to quibble on the difference between 33 percent, which is what was existing, and 25 percent, which is the alternate in this. But that is correct, Your Honor. And, in fact, the synagogues that are plaintiffs here, and there are affidavits in the record, in this case, were all abiding by the restrictions of Phase 4, abiding by the capacity limitations, abiding by the distancing, abiding by the masking and other rules. And they, too, were able to truthfully declare that there have been no outbreaks, no cases in their synagogues since the reopening, I guess, around Memorial Day. And so for these reasons, Masterpiece takes up the targeting of the orthodox community subjects, the executive order to scrutiny, and they can't satisfy that. There's an additional reason. Go ahead. I'll give you just a minute more, and then I want to ask you about the expedited appeal issue. Sure. There's an additional reason that there's subjects to scrutiny here, which is because as in Lukumi and Central Rabbinical, they were under-inclusive in terms of how the governor's executive order was drawn. So the red zones are gerrymandered to capture orthodox Jewish residents and institutions. The state ignores the typical geographic boundaries that one would use, whether they're zip codes or county lines or anything like that, and instead just gerrymanders a line that puts together really disparate orthodox Jewish communities into one red zone. You put them into that red zone, and in fact, to this day, as we heard earlier, we talk about the red zone positivity, not by neighborhood, not by zip code, but tying together communities that are really geographically and potentially otherwise miles apart. At the same time, while the governor does that to gerrymander the existence of an orthodox red zone, he has really looked aside while other communities, other counties, other geographic areas have higher positivity rates and yet fewer restrictions. So as we set forth in our reply brief at pages six and seven, while the Brooklyn red zones now in the aggregate have a positivity rate hovering at about 4%, you have, and still subject to all the severe restrictions, you have Broome County at 6.3%, Steuben County at 4.65%, Chemung County at over 8%, and Chemung is an orange zone, Steuben and Broome are yellow zones, despite the fact that they have seven-day rolling averages that are higher than the Brooklyn red zone. Those are the numbers. Judge Park, do you have any questions? No, thank you. Judge Rakoff? No, I'm fine, thank you. So, Mr. Schick, you heard your friend, Mr. Mastro, Mr. Parker. Before I get to Mr. Parker, I do want to hear from you about a possible briefing schedule, because I do think that these need to be heard in tandem by a merits panel, and I don't think you would disagree, but perhaps you will. But do you have a problem with the 30-day schedule or working that out with Mr. Parker and Mr. Mastro? I will echo what Mr. Mastro said, which is that we will do whatever is necessary to get this before as quickly as possible. So, if you all could, and of course, we're about to hear from Mr. Parker, but if you all could come together with an appropriate schedule. Regardless of what we do in connection with this particular motion, I think that that would be helpful. And if you could do it, well, if you could do it by the end of today, that would be terrific, because we can then wrap it up. Okay? Mr. Parker? Thank you, Your Honor. May it please the Court. Even assuming plaintiffs have complied with Federal Rule of Appellate Procedure 8 and they have not, this Court should deny plaintiffs emergency motion for a preliminary injunction because the District Court soundly exercised its discretion to find that plaintiffs were not likely to succeed on their free exercise claim. While this Court should deny relief on that ground alone, the District Court's reasonable exercise of discretion is further demonstrated by plaintiffs' failure to establish any of the other requirements for preliminary relief. By focusing in their complaints on holidays that have now passed rather than any ongoing issues, plaintiffs failed to establish a risk of irreparable harm independent of the constitutional violation they allege, and the District Court correctly found that the public interest imbalance of equities favor the State. On the merits, the District Court did not abuse its discretion in finding that the Executive Order A was not motivated by religious animus, and B did not restrict practices because of their religious motivation. The State used objective metrics at the outset to establish zone design. They required areas designated as a red zone to have a seven-day rolling average positive test rate of 3 percent or higher and relied on data from the electronic clinical laboratory reporting system to generate precise maps to allow for micro-targeting of neighborhoods with high positive test rates. That's from the diocese's Zucker Declaration. And as Zucker also stated in his declaration, the State looked solely at the data regardless of who or what was in the zone. That's at paragraph 19. There are specific maps that literally have dots at individual addresses where COVID cases are. And if you — I have those maps, which I'm happy to provide the court. If you take a look at those maps, you can see the red zone is tightly packed around where those dots are concentrated. And then where there's looser clusters, those are orange and yellow zones or no zones at all. I'd like to respond to my friend's comment that there are other counties, Broome, Steuben, and Chemung, with higher positive test rates that are not red zones. These are — positive test rate is just one of several factors that's considered before making something a red zone. It can be — it's good because it's not lagging. It's a current indicator. But there are problems with just looking at positive test rates because, for example, if you have an outbreak testing lots of students at the college, that they might be overrepresented in the positive test rate compared to the other communities. And that is exactly what happened in the Zoom County, had a distinct nursing home cluster initially, now has two nursing home clusters. And Steuben and Chemung County, which are continuous, had college facility outbreaks. In all three counties, there is not significant — evidence of significant spread in the broader community as there is in the Brooklyn red zone. And I'd like to — Judge Clark, can I ask you a question about if — what if the executive order, instead of saying houses of worship, it said orthodox Jewish synagogues shall be subject to such and such capacity limits? Wouldn't that be subject to strict scrutiny? Yes. Well, then how is houses of worship different? Because that would be subject to strict scrutiny under Fowler and its progeny, which says under, you know, the First Amendment, the government cannot discriminate between religious sects. But here we have an accommodation to houses of worship more generally. All other comparable public gatherings, lectures, concerts, et cetera, in red zones are banned. The reason houses of worship are called out, they could just be included with other mass gatherings and be banned as well and may be treated equally, but they are called out to accommodate them and say you could have the lesser of 25% or 10 people. And as I explained in my answer in the diocese case, under Lukumi and under central rabbinical in this court's case law, the question is not just whether they are called out. This isn't an equal protection clause case. Under the free exercise clause, the question is whether they are targeted for disfavored treatment compared to comparable secular institutions, and they are not. I'd also just like to notify this court of the relevant standard for the religious gerrymandering claim that my friend on the other side is pressing. Under Komak kosher meat, he has to show an absence of a neutral secular basis for the lines the government has drawn. And the evidence, the mapping evidence I just discussed, provides that neutral secular basis. And does the other suit from the diocese here, there are other suits from law firms and car dealerships, this all indicates that broad swaths of counties are included. And I'd just like to say, it would be extremely under-inclusive for even the Brooklyn, for even the, just the Brooklyn Orthodox Jewish community. We have, there are, as my friend on the other side knows, there is an Orthodox Jewish community in Crown Heights, there's an Orthodox Jewish community in South Williamsburg, and there are no zones of any kind, and there have never been any zones of any kind there. And if you look at the initial counties where zones applied, one of those counties was Broome County, that arose from a pub. There was no, you know, Orthodox Jewish community to speak of that was, that was raised there. And I want to address Cuomo's, the governor's comments. His comments in terms of, you know, closing the institutions down, what he actually said is, if you don't agree to enforce the rules, then we'll close the institutions down, to explain that houses of worship wouldn't be exempt from generally applicable rules regarding distancing and masking and whatnot. He didn't single them out for special treatment. He simply, for, you know, negative treatment, he just simply clarified they wouldn't receive special treatment. And this is a far cry from the Luksumi or Masterpiece Cake Shop. In those cases, the government expressed animus based on particular religious beliefs. In Luksumi, the councilman said, yeah, okay. Okay, I will just say in Masterpiece Cake Shop, the commissioner likened sincerely held religious beliefs to dispensable slavery in the Holocaust. Cuomo, by contrast, did not characterize religious beliefs or practices at all. This court should deny an injunction pending appeal. Okay. Thank you very much. And Mr. Parker, I take it you also have a problem in this connection with this motion or case with an expedited briefing schedule, as I discussed with Mr. Schick. Is that right? That's right. Okay. So we will reserve decision. Both motions are submitted. And I thank you.